# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| KAMILLYA MITCHELL, | ) | |
| o/b/o M.L.M., A Minor Child | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:11CV1575 LMB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
|     Defendant. | ) | |

## MEMORANDUM

This is a proceeding under 42 U.S.C. § 405(g) for judicial review of the defendant's final decision denying Kamillya Mitchell's application for Supplemental Security Income benefits on behalf of her daughter, M.L.M., under Title XVI of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of Complaint (Document Number 17), defendant has filed a Brief in Support of the Answer (Doc. No. 18), and plaintiff has filed a Reply (Doc. No. 21).

## Procedural History

Ms. Mitchell filed an application for Supplemental Security Income (SSI) benefits on behalf of M.L.M. on November 13, 2008, alleging an onset of disability date of September 15, 2007. (Tr. 130-34). The application was denied initially and, following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated

May 24, 2010.  (Tr. 57, 18-29).  Ms. Mitchell thereafter filed a request for review with the

Appeals Council of the Social Security Administration (SSA).  (Tr. 14).  The Appeals Council

denied Ms. Mitchell's request for review on October 19, 2011, after considering additional

evidence.  (Tr. 1-10).  Thus, the decision of the ALJ stands as the final decision of the

Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on March 2, 2010.  (Tr. 37).  Plaintiff was

present and was represented by counsel.  (Id.).  Ms. Mitchell and plaintiff's father, Mark Agnew,

were also present.  (Id.).

Plaintiff's attorney made an opening statement, in which she argued that the evidence

reveals that plaintiff has marked limitations in the domains of acquiring and using information and

attending and completing tasks.  (Tr. 40).

The ALJ first questioned plaintiff, who testified that she was twelve years old, and was in

the fifth grade.  (Id.).  Plaintiff stated that she did not remember the grade in which she was held

back.  (Id.).  Plaintiff testified that she spends some time in a special classroom, although she did

not know which classes were in the special classroom.  (Tr. 41).  Plaintiff stated that her favorite

subject was Math.  (Id.).  Plaintiff testified that she also liked Art, Music, and P.E.  (Id.).

Plaintiff testified that she did not play with neighborhood friends after school.  (Id.).

Plaintiff stated that she liked to go to the library after school.  (Tr. 42).  Plaintiff testified that she

also enjoyed playing football.  (Tr. 42).

Plaintiff testified that school was not hard for her. (Id.). Plaintiff stated that she liked her teacher, and that she had lots of friends in her class. (Id.). Plaintiff testified that she enjoyed going to birthday parties. (Id.).

Plaintiff stated that she had three sisters and one brother. (Tr. 43). Plaintiff testified that she was the oldest child in the family. (Id.). Plaintiff stated that she liked her brother and sisters. (Id.).

The ALJ next examined Ms. Mitchell, who testified that her daughter was struggling in Reading and Math. (Tr. 44). Ms. Mitchell stated that it was difficult for plaintiff to comprehend many things. (Id.). Ms. Mitchell testified that plaintiff was taking special education classes in Language and Reading. (Id.). Ms. Mitchell stated that plaintiff spent approximately one hour each day outside the regular classroom. (Id.). Ms. Mitchell testified that plaintiff was held back in kindergarten and in the first grade. (Tr. 45).

Ms. Mitchell stated that plaintiff improved when she started taking Concerta,[1] although she still has trouble. (Id.). Ms. Mitchell testified that plaintiff takes Concerta once a day. (Id.).

Ms. Mitchell stated that plaintiff's behavior has gotten worse, and that she talks during class and makes fun of other children. (Id.). Ms. Mitchell testified that plaintiff receives behavior reports from school. (Id.). Ms. Mitchell stated that plaintiff had lost her recess on multiple occasions in the weeks prior to the hearing. (Tr. 46). Ms. Mitchell testified that plaintiff gets in trouble for talking in class, laughing at other students, and not paying attention. (Id.).

Ms. Mitchell stated that plaintiff is able to read but she struggles. (Id.).

---

[1] Concerta is a stimulant indicated for the treatment of ADHD. See Physician's Desk Reference (PDR), 1925 (63rd Ed. 2009).

Ms. Mitchell testified that plaintiff is "not too bad" at home, although she has an attitude when told to do chores. (Id.). Ms. Mitchell stated that plaintiff "does okay" with her siblings. (Id.). Ms. Mitchell testified that plaintiff "does pretty good" with her chores, which include cleaning her room, taking out trash, and occasionally washing dishes. (Tr. 46-47). Ms. Mitchell stated that plaintiff is able to pay attention long enough to complete chores. (Tr. 47).

Ms. Mitchell testified that plaintiff enjoys going to the library after school. (Id.). Ms. Mitchell stated that plaintiff plays on the Internet and reads books at the library. (Id.). Ms. Mitchell testified that plaintiff also checks out books and brings them home to read. (Id.). Ms. Mitchell stated that plaintiff goes to the library with her cousins. (Tr. 48).

Ms. Mitchell testified that plaintiff's grades had improved since she started taking medication. (Id.). Ms. Mitchell stated that plaintiff earns "B"s and "C"s. (Id.). Ms. Mitchell testified that plaintiff is performing at the fourth to fifth grade level, when she should be in seventh grade. (Id.).

Ms. Mitchell stated that plaintiff attends therapy at Grace Hill approximately every two to three months. (Id.). Ms. Mitchell testified that Dr. Tillman is plaintiff's primary doctor, and that she prescribes plaintiff's medication. (Tr. 49).

Ms. Mitchell stated that plaintiff attends an after-school program from 3:30 to 5:30 two days a week for Reading and Math. (Id.). Ms. Mitchell testified that this program is not for children with special needs. (Id.).

Ms. Mitchell stated that plaintiff likes to play basketball and wants to be a cheerleader. (Tr. 50).

Ms. Mitchell testified that plaintiff's biggest problem is her reading and her behavior. (Id.).

Plaintiff's attorney examined Ms. Mitchell, who testified that plaintiff sometimes has difficulty understanding oral instructions. (Id.). Ms. Mitchell stated that she frequently repeats instructions two to three times and plaintiff still does not understand. (Tr. 51). Ms. Mitchell testified that plaintiff occasionally becomes upset when she is unable to understand. (Id.).

Ms. Mitchell stated that she helps plaintiff with her homework, and that plaintiff will "just say anything" when she does not know an answer. (Id.). Ms. Mitchell testified that plaintiff tries to answer the questions but she becomes frustrated. (Tr. 52).

Ms. Mitchell stated that plaintiff's writing is "terrible," and sometime it "doesn't even make sense." (Id.). Ms. Mitchell testified that plaintiff is able to express herself verbally, but she speaks on a third or fourth grade level. (Id.).

Ms. Mitchell stated that plaintiff is sometimes distracted when working on her homework. (Id.). Ms. Mitchell testified that plaintiff is distracted if the television is on or if people are visiting. (Tr. 53). Ms. Mitchell stated that plaintiff will stop working on her homework if Ms. Mitchell leaves the room. (Id.).

Ms. Mitchell testified that plaintiff is sometimes fidgety. (Id.). Ms. Mitchell stated that plaintiff becomes fidgety at random times. (Id.).

Ms. Mitchell testified that plaintiff has friends. (Id.).

Ms. Mitchell stated that plaintiff takes medication for allergies and asthma. (Id.). Ms. Mitchell testified that plaintiff's asthma has been under control with medication, and that plaintiff

has no physical restrictions. (Id.). Ms. Mitchell stated that plaintiff occasionally has to stop to catch her breath, and goes to the nurse to use her inhaler. (Tr. 54). Ms. Mitchell testified that plaintiff is fine after she uses her inhaler. (Id.).

Ms. Mitchell stated that plaintiff is able to dress herself and do her hair without any problems. (Id.).

## B. **Relevant Medical Records**

Plaintiff saw Martin Rosso, Ph.D., Licensed Psychologist, on December 21, 2005, for an assessment of her level of cognitive functioning. (Tr. 342-45). Dr. Rosso observed that plaintiff was friendly and cooperative. (Tr. 342). Plaintiff's attention and focus were significantly below average, and she needed to be refocused. (Id.). Plaintiff's activity level was normal. (Id.). Dr. Rosso administered the Wechsler Intelligence Scale for Children-IV ("WISC-IV"), which revealed a Verbal Comprehension Index Score of 88, Working Memory Index Score of 83, Processing Speed Index Score of 83, and Full Scale IQ of 78. (Tr. 343). Plaintiff's Full Scale IQ indicated that she functioned at the seventh percentile relative to her age level peers, and placed her in the borderline to low average range. (Id.). Dr. Rosso stated that plaintiff demonstrated below average verbal abilities, but low average to average nonverbal reasoning and visual-spatial abilities. (Tr 344). Plaintiff's working memory and processing speed was low average. (Id.). Dr. Rosso noted that plaintiff's Full Scale IQ was lowered by below average verbal abilities. (Id.). Dr. Rosso diagnosed plaintiff with attention deficit/hyperactivity disorder-inattentive type, and borderline intellectual functioning, and assessed a GAF score of 60.[2] (Tr. 345).

---

[2]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school

In January 2006, non-examining state agency psychologist R. Moreno, and speech language pathologist M. Serfas completed a Childhood Disability Evaluation Form. (Tr. 346-47). Plaintiff's impairments were listed as learning disability and language disorder. (Tr. 346). It was found that plaintiff's impairments were severe, but did not meet, medically equal, or functionally equal the listings. (Id.). Plaintiff had marked limitation in the domain of Acquiring and Using Information, less than marked limitation in the domain of Attending and Completing Tasks, and no limitation in the remaining domains. (Tr. 348-49).

The record reveals that primary care physician Mary Tillman, M.D., began treating plaintiff on September 11, 1997. (Tr. 372, 390). On March 23, 2006, Dr. Tillman noted that plaintiff had recently been diagnosed with learning disability for reading and received special education services three days a week. (Tr. 374). Dr. Tillman indicated that plaintiff had repeated kindergarten and was in first grade for the second time. (Id.).

Plaintiff saw Shulamit Portnoy, M.D., at Grace Hill Neighborhood Health Centers ("Grace Hill") on June 13, 2007, for a Neurology Initial Evaluation. (Tr. 393-94). Plaintiff's mother reported concern about plaintiff's academic difficulties, which plaintiff's teachers attributed to a short attention span and distractibility. (Tr. 393). Plaintiff did not fight with classmates and had never been suspended. (Id.). Upon examination, plaintiff read with acceptable speed and accuracy at the second grade level, and read slowly with several mistakes at the third grade level. (Tr. 394). Plaintiff used addition to answer times table questions. (Id.). Plaintiff's speech was fluent and 100 percent intelligible. (Id.). Plaintiff wrote five sentences, which contained several

functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

spelling mistakes and some illegible words (i.e. "doder" for teacher, "hwo" for nobody). (<u>Id.</u>).
Dr. Portnoy diagnosed plaintiff with ADHD, predominantly inattentive type, which symptoms
appeared to exert a significant negative impact on plaintiff's academic performance. (<u>Id.</u>). Dr.
Portnoy recommended stimulant medication and counseling with Dr. West. (<u>Id.</u>).

On August 21, 2007, Dr. Tillman noted that plaintiff had been diagnosed with ADHD,
primarily inattentive type by Dr. Portnoy, and that she was ready to start medication. (Tr. 374).
Dr. Tillman prescribed Concerta. (<u>Id.</u>). Dr. Tillman recommended that plaintiff follow up at
Grace Hill in one month. (<u>Id.</u>).

Plaintiff saw Dr. Portnoy on August 30, 2007, at which time it was noted that Dr. Tillman
had prescribed Concerta, which plaintiff's mother felt made plaintiff "more goofy and fidgety."
(Tr. 395). Plaintiff's mother indicated that plaintiff remained oppositional. (<u>Id.</u>). Upon
examination, plaintiff was quiet, cooperative, attentive, and affectionate with her younger sister.
(<u>Id.</u>). When asked whether her medication was helping, plaintiff reported "yes, it makes me do a
good job." (<u>Id.</u>). Dr. Portnoy's assessment was no clear benefit so far on Concerta, possible
behavioral rebound appreciated by mother in the evening hours. (<u>Id.</u>). Dr. Portnoy recommended
adjusting plaintiff's medication but indicated he would wait until reviewing plaintiff's school
records. (<u>Id.</u>).

Plaintiff presented to Sharon West, Ph.D. at Grace Hill on October 1, 2007. (Tr. 378).
Plaintiff reportedly was easily distracted and unable to stay on task. (<u>Id.</u>). Plaintiff had made
some improvement but not consistently. (<u>Id.</u>). Plaintiff reported some stress in the home. (<u>Id.</u>).
Dr. West's treatment focus was on self-esteem building. (<u>Id.</u>). Dr. West noted that plaintiff's

chaotic home environment may be impacting her ability to focus.  (Id.).

Plaintiff saw Dr. Portnoy on October 30, 2007, at which time plaintiff's mother reported that plaintiff was still distractible and experienced learning difficulties, particularly with reading. (Tr. 383).  There were no complaints about plaintiff's behavior from school, and plaintiff got along well with other kids.  (Id.).  Dr. Portnoy noted no abnormalities on neurologic examination. (Id.).  Dr. Portnoy diagnosed plaintiff with ADHD, predominantly inattentive type.  (Id.).  He increased plaintiff's dosage of Concerta.  (Id.).

Plaintiff presented to Dr. West for therapy on October 31, 2007, at which time she was initially difficult to engage, but warmed up considerably.  (Tr. 379).  Dr. West's treatment focus was on social skills building.  (Id.).  On December 19, 2007, Dr. West noted that plaintiff was responding well to her medication.  (Tr. 380).  Plaintiff reported that the medication stops her mind from wandering.  (Id.).  Plaintiff also reported significant stress in the home.  (Id.).

Plaintiff saw Dr. Portnoy on December 19, 2007 for a neurologic follow-up.  (Tr. 384).  It was noted that plaintiff was much better, calmer, more organized, and more focused at school. (Id.).  There were no complaints from school and no concerns about plaintiff's behavior at home. (Id.).  Dr. Portnoy's assessment was ADHD, predominantly inattentive type, improved on Concerta.  (Id.).

In a note dated January 16, 2008, Dr. Tillman indicated that plaintiff's dosage of Concerta had been increased by Dr. Portnoy.  (Tr. 374).

Plaintiff saw Dr. West on February 19, 2008, at which time she noted significant improvement in plaintiff's grades and behavior.  (Tr. 381).  Plaintiff was very proud of her

improvements and was talkative and engaging.  (Id.).

Plaintiff also saw Dr. Portnoy on February 19, 2008, at which time he noted stable improvement.  (Tr. 385).  Dr. Portnoy indicated that there were no outstanding concerns at home or at school, and plaintiff's grades were much improved.  (Id.).

Plaintiff saw Dr. Tillman on February 21, 2008, with complaints of a sore throat and sinus congestion.  (Tr. 375).  Dr. Tillman refilled plaintiff's Concerta in August 2008, October 2008, November 2008, and January 2009.  (Tr. 375, 435).  Plaintiff missed appointments in June 2009, August 2009, and September 2009.  (Tr. 435).

Plaintiff saw Dr. Portnoy on December 8, 2008, at which time it was noted that, for the past six weeks, plaintiff had been somewhat impulsive, talked in class, argued with classmates, forgot to bring homework home, and sometimes forgot to turn in completed homework.  (Tr. 386).  Plaintiff's teachers endorsed inattention and impulsivity on weekly reports.  (Id.).  Plaintiff was maintaining above average grades and was on the honor roll.  (Id.).  Dr. Portnoy's assessment was ADHD, predominantly inattentive type, residual inattention on Concerta.  (Id.).  Dr. Portnoy increased plaintiff's dosage of Concerta.  (Id.).

On January 7, 2009, Dr. Tillman completed a questionnaire.  (Tr. 372).  Dr. Tillman indicated that she had first seen plaintiff on September 11, 1997, and she had last seen plaintiff on November 17, 2008.  (Id.).  Dr. Tillman stated that plaintiff's attention deficit disorder with hyperactivity and learning disability for reading affected plaintiff's ability to perform basic tasks and make decisions required for daily living.  (Id.).

On January 8, 2009, Dr. Tillman completed a Medical Source Statement.  (Tr. 387-90).

In the domain of "Acquiring and Using Information," Dr. Tillman found that plaintiff had extreme limitations in her ability to learn new material and express ideas in writing; and marked limitations in her ability to apply previously learned material, apply problem solving skills, reading comprehension, comprehend and follow oral instructions, responsively answer questions, and solve math problems. (Tr. 388). In the domain of "Attending and Completing Tasks," Dr. Tillman expressed the opinion that plaintiff had extreme limitations in her ability to focus and maintain attention, carry through and finish activities, work without needing task redirection, maintain pace, avoid being fidgety or overactive, and control impulses; and marked limitations in her ability to remain alert and carry out instructions. (Id.). In the domain of "interacting and Relating With Others," Dr. Tillman found that plaintiff had extreme limitations in her ability to get along with other children, follow rules, avoid fighting with peers, not to be disruptive or talk out of turn, obey authority, avoid temper outbursts, initiate conversation, take turns in and maintain a conversation, and consider others' feelings and points of view; and a marked limitation in the ability to tolerate differences. (Tr. 389). In the domain of "Moving About and Manipulating Objects," Dr. Tillman found that plaintiff had extreme limitations in her general mobility and balance, and marked limitations in her use of fine motor skills and use of gross motor skills. (Id.). In the domain of "Caring for Self," Dr. Tillman expressed the opinion that plaintiff had slight limitations in her regard for safety rules, ability to use language sufficiently to express basic wants and needs, ability to cope with stress, and ability to cope with change. (Tr. 390). Dr. Tillman listed plaintiff's diagnoses as ADHD and severe learning disability. (Id.). Dr. Tillman noted that plaintiff had repeated grades three times. (Id.). Finally, Dr. Tillman indicated that the limitations

she found had existed since March 2005.  (Id.).  On December 18, 2009, Dr. Tillman completed another Medical Source Statement, in which she found the same limitations.  (Tr. 430-33).

State agency psychologist Kyle DeVore, Ph.D. and speech language pathologist Miriam Serfas completed a Childhood Disability Evaluation Form on February 4, 2009.  (Tr. 412-13).  It was found that plaintiff's impairments were severe, but did not meet, medically equal, or functionally equal the listings.  (Tr. 412).  It was noted that plaintiff had marked limitation in the domain of Acquiring and Using Information, less than marked limitation in Attending and Completing Tasks, less than marked limitation in Interacting and Relating With Others, and no limitations in Moving About and Manipulating Objects or Caring For Yourself.  (Tr. 414).

Plaintiff saw speech language pathologist Lora R. Linder for a speech and language evaluation on February 10, 2009.  (Tr. 403-05).  Ms. Linder administered the Clinical Evaluation of Language Fundamentals-Fourth Edition ("CELF-4"), which revealed a Core Language Index of 66, Receptive Language Index of 58, Expressive Language Index of 73, and Language Memory Index of 64.  (Tr. 404).  Ms. Linder indicated that scores of 86-114 were Average; 78-85 were Marginal/Borderline; 71-77 were Low range/Moderate; and 70 and below were Very low range/Severe.  (Id.).  Ms. Linder noted that plaintiff had difficulty following complex oral directions, recalling and imitating sentences verbatim, and understanding and explaining word associations.  (Id.).  Plaintiff was able to generate grammatically correct sentences within the average range.  (Id.).  Ms. Linder's informal assessment revealed that plaintiff was oriented and logical, provided eye contact, and engaged in conversation.  (Id.).  Plaintiff used vague vocabulary and had some word finding difficulties.  (Id.).  Plaintiff's speech was fully intelligible.  (Id.).  Ms.

Linder diagnosed plaintiff with severe receptive language disorder and moderate expressive language disorder. (Id.). Ms. Linder stated that plaintiff was attentive, cooperative and pleasant throughout testing. (Tr. 405). Ms. Linder expressed the opinion that plaintiff's language skills will negatively impact her school success. (Id.).

Plaintiff saw Dr. Portnoy on April 13, 2009, at which time no new concerns were noted. (Tr. 429). Plaintiff demonstrated stable improvement, was more attentive, better organized, and there were no complaints about her behavior at school. (Id.). Plaintiff was on the honor roll. (Id.). Dr. Portnoy's assessment was favorable response to Concerta. (Id.).

## C.    School Records

A multidisciplinary evaluation of plaintiff was performed in September of 2005, due to concerns in the areas of language, basic reading, reading comprehension, math computation, math reasoning, and written expression. (Tr. 176-84). In the Woodcock-Johnson Tests of Achievement-Third Edition, plaintiff scored below average in twenty out of twenty-one areas. (Tr. 177). In the Clinical Evaluation of Language Fundamentals-Fourth Edition, plaintiff scored below average in all but one area. (Tr. 178). The Weschler Intelligence Scale for Children-Fourth Addition revealed a Full Scale IQ Score of 76, which placed plaintiff in the borderline range of cognitive ability. (Tr. 179). It was noted that this IQ did not reflect plaintiff's true potential, as her scores in areas other than Verbal Comprehension were in the low average to average range. (Id.). Non-verbal IQ testing revealed an average score. (Tr. 180). Plaintiff was diagnosed with "Specific Learning Disability affecting basic reading, reading comprehension, and written language" and "Language Impairment in the areas of Semantics and Syntax." (Tr. 179).

Plaintiff was placed in special education services, and an Individualized Education Plan ("IEP") was developed. (Tr. 185-95). Plaintiff was to receive resource room services for 300 minutes, and language therapy for 90 minutes weekly. (Tr. 195).

An IEP was developed for plaintiff in September 2008. (Tr. 355-57). It was noted that plaintiff's diagnoses affected her involvement in the general education curriculum in the following ways: difficulty following written and verbal directions, completing assignments/tests in allotted time, comprehending reading material including when it is read to her, segmenting words and with word retrieval, understanding vocabulary, formulating grammatically correct sentences, answering a variety of questions, and providing synonyms and antonyms for a given word. (Tr. 355). It was determined that plaintiff would receive special education services within her regular education classroom with accommodations and modifications in the IEP, as well as language therapy. (Id.). Plaintiff's strengths were listed as: being polite and eager to learn, asks for help when she needs it, displays good work and study habits, and displays good behavior. (Id.). Plaintiff's functioning had improved in spelling and other areas. (Tr. 356). Plaintiff's Spring 2008 MAP test results revealed "basic" skills in Math, and "below basic" skills in Communication Arts. (Id.). It was noted that plaintiff's most recent evaluation revealed a full scale IQ in the average range, with cognition in the borderline range, and weaknesses in verbal comprehension and use of language to solve problems. (Id.). Plaintiff was to receive 150 minutes per week of special instruction in reading and 150 minutes per week of special instruction in written expression in the general education setting, and 120 minutes per week of language therapy in the special education setting. (Tr. 357).

Weekly behavior reports from January 23, 2009 through April 3, 2009, reveals that plaintiff's behavior on the majority of days during this period was either satisfactory or excellent. (Tr. 418-28). It was noted that plaintiff's behavior "needed improvement" on five days during this period for the following reasons: hallway behavior, excessive talking, blurting out in class, playing during class, laughing at classmates, and being inattentive/off task. (Id.).

A new IEP was developed for plaintiff on May 28, 2009. (Tr. 262-79). It was noted that plaintiff had overcome some of her shyness since her last IEP. (Tr. 264). It was also noted that plaintiff's most recent evaluation, dated March 2008, indicated a Full Scale IQ in the average range, with cognition in the borderline range, and weaknesses in verbal comprehension and use of language for problem solving. (Id.). Plaintiff was to spend six percent of her time in the special education setting, and ninety-four percent of her time in the general education setting. (Tr. 267). It was determined that plaintiff would receive more support in general education for the following reasons: to address her weaknesses in reading and language. (Tr. 271). Plaintiff would increase her minutes of support from sixty minutes to ninety minutes a day in the general education setting. (Id.).

Plaintiff's fifth grade report card reveals ratings of "satisfactory," "developing," "commendable," and "proficient." (Tr. 282). Plaintiff's grade ranged from "A"s to "D"s. (Id.).

### D.   Evidence Submitted to Appeals Council

Plaintiff's December 2010 report card revealed mostly "A"s, "B"s, and "C"s, with two "D"s, and one "F." (Tr. 296). Plaintiff's February 2011 report card again revealed grades ranging from "A"s to "F"s, with a greater number of "D"s and "F"s than the December 2010

report card.  (Tr. 297).

In a letter from plaintiff's school dated March 8, 2011, it was noted that plaintiff would be suspended for ten days for assault.  (Tr. 302).  Plaintiff had pushed a teacher in an effort to leave her classroom without permission.  (Id.).

In a letter from the school district dated March 28, 2011, it was noted that plaintiff would receive forty-five additional days of out-of-school suspension for "Repeated School Violation-Assault."  (Tr. 299).  Plaintiff was to be placed in the district's alternative education program and would be on probation for one calendar year.  (Id.).

In an IEP dated April 6, 2011, it was noted that plaintiff's cognitive ability falls within the average range, and that there was a severe discrepancy in ability and true potential.  (Tr. 307).  It was also noted that plaintiff had struggled with her actions in the fourth quarter of sixth grade, which resulted in her completing sixth grade at an alternative school.  (Id.).  Plaintiff's grades for the first three quarters ranged from "A"s to "F"'s, which reflected her struggle with turning work in daily and completing it.  (Id.).

Plaintiff received another out-of-school suspension on May 9, 2011 for insubordination. (Tr. 325).

In a letter dated April 22, 2010, plaintiff's special education teacher, Lisa Gandy, stated that she had concerns in the areas of behavior and progress.  (Tr. 439).  Ms. Gandy stated that plaintiff has difficulty paying attention, staying focused, and on task.  (Id.).

In a letter dated April 22, 2010, plaintiff's speech-language pathologist, Erin Pickar, stated that plaintiff had made great progress in language therapy that school year, however plaintiff

seemed to have difficulty attending to a conversation partner or speaker even in a small group setting.  (Tr. 440).

In a statement dated April 23, 2010, plaintiff's teacher, Angela McLemore, stated that plaintiff seems easily distracted and does not complete her assignments.  (Tr. 438).

On March 17, 2011, Dr. Tillman completed a third Medical Source Statement, in which she found the same limitations as her previous statements.  (Tr. 443-46).

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant was born on June 14, 1997.  Therefore, she was a school-age child on November 13, 2008, the date the application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2.    The claimant has not engaged in substantial gainful activity since November 13, 2008, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: borderline intellectual functioning; attention deficit hyperactivity disorder; and learning disorders in receptive language and expressive language (20 CFR 416.924(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.    The claimant does not have an impairment or combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926a).

6.    The claimant has not been disabled, as defined in the Social Security Act, since November 13, 2008, the date the application was filed (20 CFR 416.924(a)).

(Tr. 21-28).

The ALJ's final decision reads as follows:

Based on the application for supplemental security income protectively filed on November

13, 2008, the claimant is not disabled under section 1614(a)(3)(C) of the Social Security Act.

(Tr. 29).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

### B.    The Determination of Disability

A child is considered disabled if that child "has a medically determinable physical or mental

impairment, which results in marked and severe functional limitations" and which lasts for a period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i),(ii). The Commissioner has established a three-step process for determining whether a child is disabled under the Social Security Act. See 20 C.F.R. § 416.924. Under the first step, it is determined whether the child was engaged in substantial gainful activity. If substantial gainful activity is being performed, then a finding of no disability is warranted. See 20 C.F.R. §§ 416.924(b). Next, it is determined whether the child's impairments are severe. See 20 C.F.R. §§ 416.924(c). If a severe impairment is found, the next issue is whether the child's impairment meets or medically equals a listed impairment found in Appendix One to 20 C.F.R. 404. See 20 C.F.R. §§ 416.924(d); 20 C.F.R. pt. 404, subpt. P, App. 1. If it is determined that the impairment does not meet or medically equal a listing, then the final consideration is whether the child's impairment "functionally equals" a listed impairment. See 20 C.F.R. § 416.924(d).

An ALJ is to evaluate, in determining functional equivalence, a child's functional limitations in: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for himself/herself, and (6) health and physical well-being. See 20 C.F.R. § 416.926a (b)(1)(i)-(vi). A medically determinable impairment or combination of impairments functionally equals a listed impairment if it results in "marked" limitations in two domains or an "extreme" limitation in one domain. See 20 C.F.R. § 416.926a(d).

A "marked" limitation is a limitation which is "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a (e)(2)(i). A "marked" limitation can also be "equivalent to

standardized testing with scores that are at least two, but less than three, standard deviations below the mean." Id.

An "extreme" limitation is "more than marked," and is given "to the worst limitations," although it need not necessarily mean a total lack or loss of ability to function. 20 CF.R. § 416.926a(e)(3)(i).

## C.    Plaintiff's Claims on Appeal

Plaintiff first argues that the ALJ failed to properly evaluate the opinions of plaintiff's treating physician, Dr. Tillman. Plaintiff also argues that the ALJ made several errors in evaluating the evidence of record. The undersigned will discuss plaintiff's claims in turn.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more

thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

Whatever weight the ALJ accords the treating physician's report, be it substantial or little, the ALJ is required to give good reasons for the particular weight given the report. See Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). If the opinion of a treating physician is not well supported or is inconsistent with other evidence, the ALJ must consider: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by the relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which opinion is rendered, and (6) other factors which may contradict or support the opinion. See Rhodes, 40 F. Supp.2d at 1119; 20 C.F.R. § 416.927.

The ALJ noted that Dr. Tillman's opinions indicate that plaintiff is greatly functionally limited. (Tr. 28). The ALJ indicated that he was unable to attribute much weight to Dr. Tillman's opinions, as they are not supported by signs and findings consistent with the degree of limitation indicated. (Id.). The ALJ noted that Dr. Tillman's findings are inconsistent with her own treatment notes, which do not contain signs, findings, or persistent complaints or comments concerning the functional areas from the mother or plaintiff consistent with the degree of limitation indicated. (Id.). The ALJ found that Dr. Tillman's opinions are inconsistent with other evidence and inconsistencies in the record as a whole of which Dr. Tillman does not appear to have been made aware. (Id.). The ALJ specifically noted that, although Dr. Tillman finds that plaintiff is extremely limited in mobility and balance and in getting along with others, there are no

- 21 -

medically determinable impairments which would reasonably be responsible for such limitations. (Id.). The ALJ noted that plaintiff's mother testified that plaintiff got along with siblings okay, and school officials found her to be polite. (Id.).

Plaintiff contends that the ALJ failed to evaluate Dr. Tillman's opinion pursuant to all of the factors of 20 C.F.R. § 416.927. The ALJ acknowledged that Dr. Tillman was a treating physician. (Tr. 28). As plaintiff points out, Dr. Tillman began treating plaintiff in 1997, when plaintiff was approximately three months old, and continued to treat plaintiff through the date of the hearing. (Tr. 372, 390). Thus, the first factor, the length of the treatment relationship, supports giving Dr. Tillman's opinion controlling weight.

The other factors, however, do not favor giving her assessment such weight. Dr. Tillman is plaintiff's primary care provider and, as such, is not a specialist. Dr. Tillman saw plaintiff for a variety of complaints, including acute medical conditions, over the years. There is no indication in Dr. Tillman's treatment notes that she performed any type of testing with regard to plaintiff's ADHD or learning disorder. In fact, the record indicates that Dr. Tillman referred plaintiff to Dr. Portnoy and Dr. West at Grace Hill for treatment of these impairments. While Dr. Tillman initially prescribed medication after Dr. Portnoy diagnosed plaintiff with ADHD, plaintiff followed-up primarily with Dr. Portnoy and Dr. West for treatment of his ADHD. (Tr. 374). Dr. Tillman occasionally prescribed refills of plaintiff's Concerta. (Tr. 374-75).

Further, as the ALJ pointed out, Dr. Tillman's opinions are not supported by her own treatment notes or other evidence of record. Dr. Tillman's treatment notes are very brief and do not provide much detail. Dr. Tillman does not note any findings that would support the functional

limitations she found. "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes," Davidson, 578 F.3d at 843, as was Dr. Tillman's, or when it consists of conclusory ratings, as did Dr. Tillman's. See Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010). See also Clevenger v. S.S.A., 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements.").

The ALJ specifically noted inconsistencies between Dr. Tillman's opinions and the record with regard to the domains of Interacting and Relating with Others, Moving About and Manipulating Objects, and Health and Well Being. (Tr. 28). As the ALJ points out, the record is highly inconsistent with extreme limitations in these areas. In fact, there is no indication in the record that plaintiff has any physical limitations. With regard to Interacting and Relating with Others, plaintiff's mother testified that plaintiff got along with her siblings and had friends, and school records indicate that plaintiff was polite. (Tr. 46, 53, 263).

Plaintiff argues that, while the ALJ may have provided sufficient reasons for rejecting the opinions of Dr. Tillman regarding the domains of Interacting and Relating with Others, Moving About and Manipulating Objects, and Health and Well Being, he did not provide good reasons for rejecting Dr. Tillman's opinions with regard to the domains of Acquiring and Using Information and Attending and Completing Tasks. Although the ALJ provided sufficient reasons for giving Dr. Tillman's opinions less than controlling weight, a separate issue remains of whether the ALJ's

findings with regard to the five domains are supported by substantial evidence. Plaintiff does not appear to dispute the ALJ's findings regarding the domains of Interacting and Relating with Others, Moving About and Manipulating Objects, and Health and Well Being, and the undersigned finds that the ALJ's determinations with respect to these domains are supported by substantial evidence. The undersigned will discuss whether the ALJ's findings regarding the domains of Acquiring and Using Information and Attending and Completing Tasks are supported by substantial evidence.

**1.**      **Acquiring and Using Information**

In the domain of "Acquiring and Using Information," the ALJ considers how well a child acquires, learns, and uses information. 20 C.F.R. § 416.926a(g). A school age child should be able to learn to read, write, do math, and discuss history and science, to demonstrate what he has learned in an academic setting through test taking, group work, and class discussions, to use these skills in daily living situations, to share information and ideas with individuals and in groups by asking questions and expressing his own ideas, and by understanding and responding to the opinions of others. 20 C.F.R. § 416.926a(g)(2)(iv).

Examples of limited functioning in Acquiring and Using Information include situations where the claimant: (i) cannot understand words about space, size, or time; (ii) cannot rhyme words or sounds; (iii) has difficulty recalling important things she learned in school the previous day; (iv) has difficulty solving math questions or doing arithmetic; or (v) is unable to talk in short, simple sentences, and has difficulty explaining what she means. 20 C.F.R. § 416.926a(g)(3)(i)-(v).

A child has an "extreme" limitation if that child has a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure functioning in that domain, and the child's day-to-day functioning in that domain is consistent with that score. Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 723 (8th Cir. 2005) (citing 20 C.F.R. § 416.926a(e)(3)(iii)). Under the regulations, the mean IQ score on the Wechsler series is 100, with a standard deviation of 15. Id.; Scales v. Barnhart, 363 F.3d 699, 704 (8th Cir. 2004). A valid IQ score of 55 represents exactly three standard deviations below the mean. Scales, 363 F.3d at 704.

The ALJ found that plaintiff has less than marked limitation in Acquiring and Using Information. (Tr. 23). The ALJ acknowledged that plaintiff attained a full scale IQ score of 78 in December 2005, which placed her in the borderline range of functioning, and that plaintiff had below average verbal abilities. (Tr. 23, 343-44). The ALJ also noted that plaintiff has repeated two grades. The ALJ, however, stated that plaintiff's most recent evaluation in March 2008 indicated a full scale IQ in the average range, with cognition in the borderline range and weaknesses in verbal comprehension and use of language for problem solving. (Tr. 23, 264). The ALJ stated that the "increase in the full scale IQ score to average indicates a significant improvement from December 2005." (Tr. 23). The ALJ summarized plaintiff's May 2009 IEP, which noted the difficulties plaintiff experienced as a result of her learning disability. (Tr. 23, 262-79). The ALJ noted that plaintiff received accommodations and services, which allowed her to spend ninety-four percent of her time in the general education setting. (Tr. 23, 267). The ALJ pointed out that, on plaintiff's fifth grade report card, she received nearly all "Developing,"

"Commendable," or "Satisfactory," with no areas marked as "Need Improvement" or Unsatisfactory." The ALJ noted plaintiff's mother's testimony that plaintiff had improved since she started taking Concerta, that plaintiff receives "Bs" and "Cs," and that plaintiff occasionally does not understand spoken instructions. (Tr. 23, 45, 48, 50). Finally, the ALJ noted that plaintiff's teachers and school district officials have indicated that plaintiff is polite and eager to learn, not afraid to ask for help when she needs it, and has good work and study habits. (Tr. 23, 263).

Plaintiff contends that the ALJ's findings are not supported by substantial evidence. Plaintiff specifically argues that the ALJ's statement that plaintiff had an overall IQ that was average and that this score reflected "significant improvement" was error. The undersigned agrees.

The ALJ's statement that plaintiff's most recent evaluation in March 2008 indicated a full scale IQ in the average range, with cognition in the borderline range and weaknesses in verbal comprehension and use of language for problem solving was taken from plaintiff's IEPs from September 2008 and May 2009. (Tr. 356, 264). As plaintiff notes, the record shows no new IQ testing since December 2005, when Dr. Rosso administered the WISC-IV, which produced scores in the borderline to low average range. (Tr. 342). Even if plaintiff had undergone subsequent testing which revealed a full scale IQ in the average range as the IEPs suggest, the IEPs also note that the testing revealed that plaintiff's cognition was in the borderline range and that plaintiff displayed weaknesses in verbal comprehension and use of language for problem solving. (Tr. 356, 264). In addition, plaintiff's May 2009 IEP indicated that plaintiff's diagnoses affected her

progress in the general education curriculum in the following ways: difficulty following both verbal and written directions, difficulty completing assignments/tests in the allotted time, difficultly comprehending reading material even when it is read to her, difficulty with vocabulary including vocabulary related to content areas of math and science, difficulty expressing her thoughts and ideas completely in sentences, difficulty understanding complex directions, difficulty with reading comprehension and answering complex questions, difficulty with cause and effect and inferences, and difficulty generalizing her language skills across all contexts. (Tr. 263). Thus, even if plaintiff underwent subsequent IQ testing that is not included in the record, plaintiff's IEP alone does not support the finding of significant improvement in plaintiff's intellectual functioning.

The medical records also do not support the ALJ's finding. Plaintiff saw speech pathologist Lora R. Linder on February 10, 2009, for a speech and language evaluation. (Tr. 403-05). Ms. Linder administered testing, which revealed scores that were "Very low range/Severe," and "Low range/Moderate." (Tr. 404). Ms. Linder noted that plaintiff had difficulty following complex oral directions, recalling and imitating sentences verbatim, and understanding and explaining word associations. (Id.). Plaintiff used vague vocabulary and had some word finding difficulties. (Id.). Ms. Linder diagnosed plaintiff with severe receptive language disorder and moderate expressive language disorder. (Id.). Ms. Linder stated that plaintiff's language skills will negatively impact her school success. (Tr. 405). In addition, state agency psychologist Kyle DeVore, Ph.D. and speech language pathologist Miriam Serfas expressed the opinion that plaintiff had marked limitation in the domain of Acquiring and Using

Information. (Tr. 414). In support of this finding, Dr. Devore and Ms. Serfas pointed to plaintiff's IQ scores and diagnosis of borderline intellectual functioning, her diagnosis of learning disorder, the fact that she has repeated two grades, and her diagnoses of severe receptive language impairment and moderate expressive language impairment. (Id.).

Defendant points out that Drs. Portnoy and West noted that plaintiff was responding well to medication, and that plaintiff's grades were improving. While it is true that plaintiff was earning satisfactory grades during the relevant time period, plaintiff was receiving special education services and special accommodations. In addition, plaintiff was held back on two occasions and was, therefore, two years older than her classmates.

The regulations require that the ALJ compare plaintiff's functioning to "the typical functioning of children [plaintiff's] age who do not have impairments." 20 C.F.R. § 416.926a(f)(1). In determining that plaintiff had marked limitation in the domain of Acquiring and Using Information, Dr. DeVore properly considered plaintiff's functioning as compared to her same-age peers. (Tr. 414). Dr. DeVore noted that Ms. Linder found that plaintiff was "functioning significantly behind same age peers academically based on the fact that she is 2 yrs [sic] behind them in grade level." (Id.). Although the ALJ indicated that he was assigning "significant weight" to the opinions of the state agency psychological consultants, he found that plaintiff had less than marked limitation in the domain of Acquiring and Using Information, which was inconsistent with the opinion of the state agency psychological consultant and the majority of the record.

While the ALJ's finding that plaintiff has less than marked limitation in the domain of

Acquiring and Using Information is not supported by substantial evidence, the record does not support the presence of an "extreme" limitation in this domain. Notably, plaintiff has never received an IQ score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure functioning in that domain. Despite plaintiff's problems in school caused by her learning disorder and language impairments, her limitations are not among the "worst limitations." 20 C.F.R. § 416.926a(e)(3)(i).

## 2.    Attending and Completing Tasks

"When considering the attending and completing tasks domain, the inquiry focuses on how well the child is able to focus and maintain his or her attention and how well the child begins, carries through, and finishes activities." England v. Astrue, 490 F.3d 1017, 1022 (8th Cir. 2007) (citing 20 C.F.R. § 416.926a(h)). A school-age child should be able to focus her attention in a variety of situations, to concentrate on details, to change activities or routines without distracting herself or others, to stay on task, and to complete a transition task without extra reminders and accommodation. 20 C.F.R. § 416.926a(h)(2)(iv) (A school-age child should also be able to follow directions, remember and organize school materials, complete assignments, and sustain attention well enough to participate in group sports, read independently, and complete family chores). See also Social Security Ruling 09–4p, 2009 WL 396033 (Feb. 18, 2009) (The inquiry also includes consideration of the child's alertness and ability to focus on an activity or task despite distractions, to perform tasks at an appropriate pace, to change focus after completing a task, and to avoid impulsive thinking and acting).

Examples of limited functioning in Attending and Completing Tasks include situations

where the claimant: (i) is easily startled, distracted, or overreactive to sounds, sights, movements, or touch; (ii) is slow to focus on, or fail to complete activities of interest to you; (iii) repeatedly becomes sidetracked from her activities or frequently interrupts others; (iv) is easily frustrated and gives up on tasks, including ones she is capable of completing; or (v) requires extra supervision to keep her engaged in an activity. 20 C.F.R. § 416.926a(h)(3)(i)-(v).

The ALJ found that plaintiff has less than marked limitation in the domain of attending and completing tasks. (Tr. 24). As support for this finding, the ALJ cited plaintiff's mother's testimony that plaintiff becomes distracted from the task at hand if people are visiting or the television is on, plaintiff becomes off task if her mother leaves the room, plaintiff completes chores, and plaintiff accesses programs over the Internet at home. (Tr. 24, 46-47, 52-53). The ALJ noted that plaintiff's weekly school behavior reports reveal that plaintiff's behavior was satisfactory every week but one. (Tr. 24, 418-28). The ALJ concluded that plaintiff has been able to maintain sufficient sustained concentration to complete tasks and to do satisfactory daily work. (Tr. 24).

The undersigned finds that the ALJ's determination is supported by substantial evidence. As the ALJ noted, plaintiff's mother's testimony supports the presence of less than marked limitation in the domain of Attending and Completing Tasks. Plaintiff's mother, Ms. Mitchell, testified that plaintiff "does pretty good" with her chores, and that plaintiff is able to pay attention long enough to complete chores. (Tr. 46-47). Plaintiff's chores include cleaning her room, taking out trash, and washing dishes. (Id.). Ms. Mitchell testified that plaintiff plays on the Internet, and reads books at the library and at home. (Id.). Ms. Mitchell stated that plaintiff occasionally

becomes distracted when working on her homework, although Ms. Mitchell indicated that this occurred when the television was on or if people were visiting. (Tr. 53). Ms. Mitchell stated that plaintiff stops working on her homework if Ms. Mitchell leaves the room, and that plaintiff is sometimes fidgety. (Id.).

The medical and school records also support the ALJ's finding. As the ALJ pointed out, plaintiff's weekly behavior reports indicate that plaintiff's behavior was satisfactory in all but one week, and that plaintiff's behavior was "excellent" on many days. (Tr. 24, 418-28). The behavior reports did, however, note behavior that needed improvement. For example, the following behavior was noted: hallway behavior, excessive talking/loudness, blurting out in class, playing in class, bothering classmates, inattentiveness/off task, and disruptive behavior. (Tr. 418-28). Dr. Portnoy found that plaintiff was more organized and focused since starting Concerta, and that there were no complaints about plaintiff's behavior at school. (Tr. 384, 385). In December 2008, Dr. Portnoy indicated that plaintiff had been impulsive and inattentive for a six-week period. (Tr. 386). He increased plaintiff's dosage of Concerta. (Id.). In April 2009, Dr. Portnoy stated that plaintiff had demonstrated stable improvement, was more attentive, better organized, and there were no complaints about her behavior at school. (Tr. 429). Dr. West also noted that plaintiff's grades and behavior improved significantly with medication. (Tr. 381). Finally, the state agency psychologist, Dr. DeVore, expressed the opinion that plaintiff had less than marked limitation in the domain of Attending and Completing Tasks. (Tr. 414). Thus, the ALJ's finding is supported by substantial evidence in the record as a whole.

Plaintiff contends that plaintiff's behavior has declined, as is evidenced by the records

submitted to the Appeals Council. Plaintiff points out that an ALJ recently issued a favorable decision on plaintiff's subsequent claim for benefits, finding that plaintiff had marked limitation in the domains of Acquiring and Using Information and Attending and Completing Tasks.

The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision. 20 C.F.R. § 404.970(b); Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000). The newly submitted evidence becomes part of the administrative record, even though the evidence was not originally included in the ALJ's record. Id. This Court does not review the Appeals Council's denial but determines whether the record as a whole, including the new evidence, supports the ALJ's determination. Id. Medical evidence obtained after an ALJ decision is material if it relates to the claimant's condition on or before the date of the ALJ's decision. See Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990).

In this case, the Appeals Council indicated that it considered the following new evidence : letters from plaintiff's special education teacher and speech-language pathologist dated April 23, 2010; a progress report and report cards dated December 14, 2010 to February 6, 2011; a discipline notice dated March 8, 2011; and an IEP dated April 6, 2011. (Tr. 6, 9). The Appeals Council noted that the ALJ decided plaintiff's case through May 24, 2010, and that the new evidence does not affect the decision about whether plaintiff was disabled beginning on or before May 24, 2010.

The undersigned finds that the new evidence either does not relate to the period prior to the ALJ's decision, or does not affect the ALJ's decision as to the domain of Attending and

Completing Tasks.  The only evidence within the relevant period are the letters from plaintiff's teachers dated April 23, 2010.  While these letters note difficulties with attention, the ALJ's determination that plaintiff has less than marked limitation in Attending and Completing Tasks remains supported by substantial evidence for the reasons discussed above.  The remainder of the evidence relates to a time period after the ALJ's decision.

In sum, the ALJ did not err in his finding that plaintiff had a less than marked limitation in the domain of Attending and Completing Tasks.  His error as to the domain of Acquiring and Using Information is therefore rendered harmless because the evidence described above demonstrates that plaintiff does not have an "extreme" limitation in that domain.  See Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995) (holding that "reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial"); Muhammad ex rel. T.I.M. v. Commissioner of Social Sec., 395 Fed. Appx. 593, 601–02 (11th Cir. 2010) (finding that even if substantial evidence did not support the ALJ's determination that the claimant had less-than-marked limitations in one domain, that error was harmless because the evidence showed that the claimant did not have marked or extreme limitations in any other domains).

**<u>Conclusion</u>**

The undersigned finds that substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment between the dates of September 15, 2007, and May 24, 2010.

Dated this 19th day of February, 2013.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE